UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
MICHAEL BURGESS,                              :
                                             : 09 Civ. 9151 (BSJ)(THK)
                    Petitioner,              :
                                             :
                                             :
        -against-                            :
                                             :      **REPORT AND**
                                             :      **RECOMMENDATION**
JAMES CONWAY, Superintendant                 :
                                             :
                                             :
                    Respondent.              :
---------------------------------------X

**TO: HON. BARBARA S. JONES, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

This habeas corpus proceeding was referred to this Court for
a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B)
and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern
District of New York.

Petitioner Michael Burgess ("Petitioner") was convicted on
March 10, 2004, of Murder in the Second Degree (New York Penal Law
§ 125.25(1)), and Criminal Possession of a Weapon in the Second
Degree (New York Penal Law § 256.03), following a jury trial in New
York State Supreme Court, Bronx County, and was sentenced to an
indeterminate term of imprisonment of from twenty-five years to
life and to a determinate term of imprisonment of fifteen years,
respectively, to be served concurrently. Petitioner is presently
incarcerated at the Attica Correctional Facility.

1

Petitioner seeks habeas corpus relief, pursuant to 28 U.S.C. § 2254, claiming that (1) he was denied effective assistance of counsel when trial counsel failed to use a DD-5 police report both to argue that the prosecution had failed to establish probable cause to arrest him and to impeach the prosecution's primary witness at trial, and (2) that the state appellate court erred in ruling that a witness's single-photo identification was merely confirmatory and was not therefore unduly suggestive. (See Petition for a Writ of Habeas Corpus, filed November 3, 2009 ("Pet."), at 6-9; Memorandum of Law in Support of Petition for Writ of Habeas Corpus, dated November 3, 2009 ("Pet'r Mem."), at 17, 31.) Respondent contends that Petitioner's exhausted claims are without merit. (See Respondent's Memorandum of Law ("Resp't Mem.) at 4, 16.) For the reasons that follow, this Court agrees with Respondent and respectfully recommends that the Petition be denied and this action be dismissed with prejudice.

BACKGROUND

## I.   The Crime: Evidence Adduced at Trial

On the evening of September 9, 2002, Craig Washington ("Washington") was returning to his apartment at 2427 Webster Avenue in the Bronx when he encountered Leroy Conner, whom Washington knew only by the name of "Stripper," and from whom

Washington had purchased drugs for a period of more than a year.[1] (See Trial Transcript, dated February 20, 2004 ("Trial Tr."), at 376-78.)  Washington purchased about ten dollars worth of crack cocaine from Conner.  (See id. at 384-85.)  Washington also arranged for Conner to deliver heroin to his apartment later that night.  (See id. at 385-86.)

Washington returned to his apartment where he smoked a "hit" of crack cocaine while he waited for Conner.  (See id. at 386.) Approximately thirty to forty minutes later, Washington allowed Conner, accompanied by Petitioner, into his apartment.  (See id. at 387.)  Conner gave Washington a bag of heroin and asked if he could use the apartment to "bring a girl over."  (See id. at 389.) Washington consented and retired to his bedroom where he snorted a line of heroin.  (See id. at 389, 391.)

Approximately ten minutes later, on his way to the kitchen for a cup of water, Washington heard "three to four gunshots" which sounded to him as though they were coming from his living room.(See id. at 391-92, 468.)  Washington proceeded to the living room where, by the light coming from the adjacent kitchen, he saw Conner and Petitioner on their knees, firing guns from the living room

---

[1] At trial, Washington identified a photograph of Lamar Conner as that of the individual he knew as "Stripper."  (See Trial Tr. at 379.)

windows into the courtyard below.  (See id. at 392-93, 455.)

Petitioner and Conner directed their fire at Jason Russell and Steven Nieves, rival drug dealers from Manhattan. (See id. at 168.) Over the previous two to three months, Russell and Nieves had made regular visits to 2427 Webster Avenue for the sole purpose of selling drugs, in direct competition with Conner and his associates. (See id. at 168-69.) As they climbed the steps leading to the courtyard of the apartment complex, Nieves heard the first of a series of gunshots. (See id. at 172.) Nieves pulled out his own weapon and began to indiscriminately return fire, wounding three bystanders in the process. (See id. at 173-74, 263-65.) Nieves turned around and called out Russell's name, but saw him "on his back with a puddle of blood forming, vomiting, and twitching." (See id. at 173.) Nieves, having fired all the rounds in his weapon, and having determined that Russell "wasn't going to make it," fled the scene, only to be apprehended by police shortly thereafter. (See id. 174-76.) Russell ultimately died from injuries caused by a bullet entering the top left portion of his brain. (See id. at 545.)

Washington, upon seeing that Conner and Petitioner were firing guns from his living room, had meanwhile retreated back into his bedroom. (See id. 393-94.) He didn't leave his bedroom again until he heard his apartment door close a few minutes later. (See id.)

Washington entered his living room, turned on the lights, and saw two guns; one on his window ledge and another on the floor. (See id. at 394.)  Shortly thereafter, he received a call from Conner, who told him that an individual Washington knew as Dre would come to the apartment to collect the weapons. (See id. at 395.)  Five to ten minutes later, Dre came to the apartment and, without saying anything, gathered the guns and shell casings and took them away. (See id. at 397, 476.)

Shortly after Dre's departure, Washington left his apartment and joined Conner, Dre, Petitioner, and a man named "Little" on a bench across the street from the building. (See id. at 398-99.) According to Washington, Dre and Little instructed him to tell the police (who had by now arrived at the scene) that two individuals named Reggie and Shocka had broken into his apartment, fired their guns from his windows, and killed Russell. (See id. at 400.) Washington, who testified to being "afraid" and "intimidated" by Dre and Litte, approached a detective at the scene and related this story, while the others remained on the bench nearby. (See id. at 400, 403-04.)  After relating this story to the detective, Washington returned to his apartment. (See id. at 404.)  Fifteen to twenty minutes later, Dre returned to Washington's apartment and removed the curtains from the window. (See id. at 405.)  While doing so, he told Washington to "make sure that [he] follow up with

the police" and that they were going "to make sure that [he was] taken care of," which Washington took to mean that he would be supplied with free or greatly discounted drugs. (See id. at 405-06.)

The day after the shooting, Washington saw Conner near the building and asked for the drugs that he had been promised. (See id. at 407-08.) Conner gave Washington five bags of crack cocaine and two bags of heroin for free. (See id. at 408.) Washington received a similar quantity of drugs from Conner the following day. (See id. at 410.) Washington testified that later that same night, Conner told him that "you are the only witness to this, you know. So you know, I can do without you." (Id.)

Washington, frightened by what he understood to be a serious threat and fearing for his life, called Detective Castro the following day. (See id. at 411, 414.) On or about September 16, 2002, Washington met with Castro at the precinct where he offered substantially the same story as he provided at trial. (See id. at 411-12.) In his meeting with Castro, Washington named Conner as one of the two shooters and explained that while he didn't know the name of the second shooter, he had seen him every day for several months at the building, and described him as a black male, approximately sixteen to eighteen years old. (See id. at 349, 425.) Subsequent to this discussion, Washington recognized photographs of both Conner

6

and Dre in separate photo arrays.   (See id. at 330-31, 412-13.)

On September 18, while riding a bus home from work, Washington saw Petitioner standing on Webster Avenue between 187th and 188th Streets, wearing a purple and white football-type jersey.   (See id. at 414-15.)   Washington attempted to call Castro from a nearby pay-phone but, unable to reach him, called District Attorney Christine Scaccia instead.   (See id. at 415.)   After describing Petitioner to Scaccia, Washington returned to the hotel room provided to him by the police.   (See id.)   Scaccia relayed this information to a Detective Withers, who proceeded to the location given by Washington and took Petitioner into custody on the basis of the information provided by Washington.   (See id. at 158-59.)

At the station, Castro asked Petitioner to remove his do-rag and jersey to avoid suggestiveness, and then took a single photograph of Petitioner.   (See id. at 358-59.)   Castro then brought the photograph to the hotel where Washington was staying.   (See id. at 359.)   Washington initially testified that Castro said nothing to him prior to showing Washington the photo, but on cross-examination, Washington stated that Castro asked if the person in the photograph was the individual Washington had called about, and that the detective may also have asked if Washington recognized the person in the photo.   (See id. at 504.)   Washington identified

7

Petitioner through his photo as the second shooter.[2]  (See id. at

359-60.)  At trial, Washington stated that he identified Petitioner

as the second shooter because he recognized him, not because he was

shown the photograph. (See id. at 529-30.)     Castro returned to the

precinct house and, after advising Petitioner of his rights,

obtained both written and video statements from him.  (See id. at

275, 278.)

In a video statement, which was shown to the jury, Petitioner

stated that on September 9, 2002, he accompanied Conner to the

apartment of one of Conner's customers, which was located on the

second floor of 2427 Webster Avenue. (See id. at 283-84.) Petitioner

claimed that Conner was supposed to give him five dollars, so he

waited in the hallway by the apartment door while Conner entered the

apartment alone.  (See id.)  Upon receiving the five dollars he was

owed, Petitioner claimed that he left the building to purchase

cigarettes, while Conner remained at the apartment.  (See id.)

Petitioner stated that he then went to see his girlfriend,

Teresa Gill, who lived in the same building.  (See id.)  According

to Petitioner, as he knocked on the door, he heard three to four

---

[2] Petitioner contends that Castro's use of a single-photo
identification procedure was unduly suggestive, and that as a
consequence, the trial court should not have allowed Washington's
subsequent in-court identification.  (See Pet'r Mem. at 31.)
Petitioner's contention will be discussed in detail infra.

gunshots, which sounded to him like they were coming from the floors beneath him. (See id.) Inside the apartment were Gill, her aunt, her uncle, and her brother's girlfriend. (See id.)

Gill, who testified at trial in support of Petitioner's alibi, stated that she heard gunshots at the same time that she heard Petitioner knocking at the door saying "open the door, it's shots being fired." (See id. at 570-71.) Gill further testified that she continued to hear shots being fired even after her aunt had admitted Petitioner to her apartment. (See id. at 570.) Gill stated that she knew Conner, who was a friend of Petitioner, and that he was not with Petitioner at the time. (See id. at 580-81.)

Approximately twenty minutes later, Gill went downstairs with her aunt and Petitioner, but they were forced to go back upstairs because the police weren't allowing anyone to exit the building. (See id. at 584-87.) Gill and Petitioner were finally able to exit the building several hours later, and saw Petitioner's brother standing across the street. (See id. at 588-91.) Petitioner, along with his brother, took a cab to their grandmother's home, which was also Petitioner's primary residence. (See id. at 589.) According to Gill, the police never interviewed her about the shooting or about Petitioner's whereabouts on the night of the shooting. (See id. at 574.)

After two days of deliberation, the jury convicted Petitioner

9

of Second Degree Murder and Criminal Possession of a Weapon in the Second Degree. (See Trial Tr. at 883-84.) On March 10, 2004, the court sentenced Petitioner to concurrent prison terms of twenty-five years to life and fifteen years.

## II. The Pre-trial Rodriguez Hearing

Prior to trial, a joint Rodriguez/Huntley/Dunaway hearing was held, before the Honorable Richard Lee Price, to determine, among other things, whether the use of a single photo to identify Petitioner was unduly suggestive or was merely confirmatory.[3] Washington did not testify at the hearing and the prosecution instead relied on the testimony of Detective Castro.

Castro testified that in the days following the shooting, he received information through the "Crime Stoppers" system indicating that two individuals named "Stripper" and "Mike" were responsible for the September 9 shootings. (See Hearing Transcript, dated January 7, 2004 ("Hr'g Tr."), at 47.) Castro further testified that on September 16, Washington met with him and told him that he had personal knowledge of the shooting. (See id. at 52-53.) According to Castro, Washington described how two men, Stripper and "this

_____

[3] New York law allows for in-court identifications despite what would otherwise be considered unduly suggestive pretrial procedures, provided the witness knew the defendant and was therefore immune from suggestion. See People v. Rodriguez, 79 N.Y.2d 445, 449-50 (1992).

other guy," fired weapons from his window on the night of the murder. (See id. at 52.) Washington said he had known Stripper for over two years, and that he saw him "every day." (See id. at 54.) While Washington did not know the name of the second shooter, Castro testified that Washington told him that he had known him for "several months" and had seen him "every day" in front of the building. (See id. at 55.) Washington provided no further descriptive details of Petitioner. (See id. at 84-85.)

Castro played no role in the arrest of Petitioner. (See id. at 62.) Castro arrived at the precinct house after Petitioner's arrest, where he took a single photograph of Petitioner and brought it to Washington for identification. (See id. at 64-65, 97-98.) Castro's testimony concerning Washington's identification of Petitioner as the second shooter was substantially the same testimony as he would offer at trial. (See id.) When asked why he used a single photograph to identify Petitioner, Castro replied "[Washington] picked [Petitioner] out in the street. I just needed to be sure." (See id. at 64-65.)

Following Castro's testimony, Detective Withers testified that he had received a phone call from Scaccia, the prosecuting attorney on the case, directing him to pick up Petitioner. (See id. at 160.) Scaccia informed Withers that the suspect had been seen in the vicinity of 2427 Webster Avenue wearing a purple jersey and a do-

11

rag.  (See id. at 160.)

At the conclusion of the hearing, defense counsel argued that the single-photo procedure used to identify Petitioner was unduly suggestive and that it tainted any subsequent in-court identification.  (See id. at 167.)  Defense counsel further argued that the description Washington provided of the second shooter could apply to innumerable people and, as such, failed to establish a degree of familiarity between Washington and Petitioner sufficient to render the identification merely confirmatory.  (See id. at 165-68.)  The court, without providing its rationale, denied Petitioner's motion to suppress Washington's identification of Petitioner.  (See id. at 181.)

## III. Petitioner's Appeal

Petitioner appealed his conviction to the Appellate Division First Department.  The only issue raised on direct appeal relevant to this Petition was whether the trial court erred in denying Petitioner's motion to suppress Washington's identification testimony.[4]  (See Brief for Defendant-Appellant, dated November 6,

_____

[4] Petitioner also contended in his direct appeal that: (1) his conviction was against the weight of the evidence; (2) he was denied a fair trial because the trial court refused to charge the jury on the issue of accomplice corroboration with respect to Washington; and (3) his due process rights were violated when the trial court allowed the admission of uncharged "bad act" allegations of gang violence unrelated to the shooting. (See Pet'r App. Br. at 46, 82, 92.)

2006 ("Pet'r App. Br."), at 61, attached as Ex. 1 to Resp't Mem.)
On May 10, 2007, the Appellate Division affirmed Petitioner's
conviction, holding that "[t]he prosecution satisfied its burden of
establishing that a witness's single-photo identification was
confirmatory."[5]   See People v. Burgess, 40 A.D.3d 322, 836 N.Y.S.2d
94, (1st Dep't 2007).   On September 12, 2007, the Court of Appeals
denied leave to appeal.   See People v. Burgess, 9 N.Y.3d 921 (2007).

## IV.   Petitioner's § 440.10 Motion

On December 4, 2008, Petitioner, through counsel, moved to
vacate the judgment of conviction, pursuant to New York Criminal
Procedure Law ("NYCPL") § 440.10, on the ground that his trial
attorney was ineffective.   Petitioner alleged that, among other
things,   his trial counsel: (1) failed to impeach the sole
eyewitness's credibility by introducing at trial a DD-5 police
report that allegedly disproved the witness's testimony that he saw
Petitioner on the street over a week after the shooting incident;

---

[5] Whether or not a pretrial identification procedure is
"merely confirmatory" is a question of state law not cognizable
on federal habeas review.   See Wiggins v. Greiner, 132 Fed. App'x
861, 865 n.3 (2d Cir. 2005).   However, New York's "confirmatory
identification" rule tracks the federal standard that
identification procedures raise due process concerns only to the
extent that they yield "unreliable" identifications.   Espinal v.
Duncan, No. 00 Civ 4844 (RWS), 2000 WL 1774960, at *3 (S.D.N.Y.
Dec 4. 2000)(internal quotation omitted)(citing Manson v.
Brathwaite, 432 U.S. 98, 114 (1977); Neil v. Biggers, 409 U.S.
188, 199-201 (1972)).

and (2) failed to properly contest whether the police had probable cause to arrest Petitioner. *See* Petitioner's Memorandum of Law in Support of Petioner's § 440 Motion ("Pet'r 440 Mem.") at 10-15, attached as Ex. 4 to Resp't Mem.)   In a written decision dated August 5, 2009, the hearing court found that any failure by trial counsel to use the DD-5 police report to impeach Washington was not "error that is sufficiently egregious to support a finding of ineffective assistance and prejudice to the defendant." (*See* § 440 Motion Decision and Order ("440 Dec.") at 7-8, attached as Ex. 9 to Resp't Mem.)   The trial court further determined that, as conceded by Petitioner, defense counsel had indeed argued the issue of probable cause, and while Petitioner may not have been personally satisfied with that argument, "effective assistance of counsel is neither determined nor predicated on whether the defendant is personally satisfied." (*See* *id.* at 9.)   Whether defense counsel might have used the DD-5 police report to further develop his argument "would be to judge counsel's trial strategy with hindsight," which the trial court was reluctant to do.   (*See* *id.*) Having found that trial counsel's performance did not prejudice Petitioner, the trial court chose not to rely on the first prong of the *Strickland* test and denied Petitioner's motion in its entirety. (*See* *id.* at 9.)

14

## DISCUSSION

Petitioner now asserts in this proceeding, as he did in his § 440 motion and in his direct appeal, that: (1) he was denied effective assistance of trial counsel; and (2) the Appellate Division erred in ruling that a witness's single-photo identification was merely confirmatory and was not therefore unduly suggestive.

### I.   Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (2008), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Leslie v.

Artuz, 230 F.3d 25, 32 (2d Cir. 2000); Clark v. Stinson, 214 F.3d
315, 320 (2d Cir. 2000).  The phrase "clearly established Federal
law, as determined by the Supreme Court of the United States" limits
the law governing a habeas petitioner's claims to the holdings (not
dicta) of the Supreme Court existing at the time of the relevant
state-court decision. See Williams, 529 U.S. at 412, 120 S. Ct. at
1523; Leslie, 230 F.3d at 32.

     "The 'unreasonable application' standard is independent of the
'contrary to' standard," and "means more than simply an 'erroneous'
or 'incorrect' application" of federal law.  Henry v. Poole, 409
F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at 411, 120
S. Ct. at 1522).  A state court decision is based on an
"unreasonable application" of Supreme Court precedent if it
correctly identifies the governing legal rule, but applies it in an
unreasonable manner to the facts of a particular case. See Williams,
529 U.S. at 413, 120 S. Ct. at 1523.  The Second Circuit has noted
that "Williams also made clear that a federal habeas court may
permissibly conclude that federal law has been unreasonably applied
by the state court even though not all reasonable jurists would
agree that the state court's application was unreasonable." Henry,
409 F.3d at 68.  Thus, a court should inquire as to whether the
state court's application of federal law was "objectively
unreasonable," falling "somewhere between merely erroneous and

16

unreasonable to all jurists." (Id. (internal quotations omitted).)

In addition, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003). A state court's decision adjudicated on the merits and based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

## II.  **Ineffective Assistance of Counsel**

Petitioner contends that he was denied effective assistance of trial counsel because: (1) counsel failed to use a DD-5 police report to contest the issue of probable cause at the pre-trial suppression hearing, by questioning the basis of the information relayed by Scaccia to the arresting officer; and (2) counsel failed to use the same report to impeach the credibility of Washington, the prosecution's sole eyewitness. Respondent, who concedes that the Petition is timely and that Petitioner has exhausted his state remedies, contends that Petitioner's claims are without merit and

17

that the Petitioner has failed to demonstrate that the state court unreasonably applied clearly established federal law when it decided that counsel's representation did not prejudice the outcome of the trial. (<u>See</u> Resp't Mem. at 14.)  The Court agrees with Respondent.

    A.   <u>Legal Standard</u>

For the purpose of AEDPA, ineffective assistance of counsel claims are "squarely governed by [the Supreme Court's] holding in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984)." <u>Williams</u>, 529 U.S. at 390, 120 S. Ct. at 1511; <u>accord</u> <u>Eze v. Senkowski</u>, 321 F.3d 110, 124 (2d Cir. 2003).  A petitioner must satisfy a two-part test in order to establish that his Sixth Amendment right to effective assistance of counsel has been violated.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064; <u>Henry</u>, 409 F.3d at 62-63; <u>Lanfranco v. Murray</u>, 313 F.3d 112, 118 (2d Cir. 2002).  A petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient performance of counsel prejudiced the defense.  <u>See</u> <u>Henry</u>, 409 F.3d at 63 (quoting <u>Strickland</u>, 466 U.S. at 687-88, 104 S. Ct. at 2052).

In applying the first prong of the <u>Strickland</u> test, determining the quality of representation, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (citation and internal quotation marks omitted); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2001) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks and citations omitted). "[A] strategic decision is a 'conscious, reasonably informed decision made by an attorney with an eye to benefitting his client.'" Cox v. Donnelly, 387 F.3d 193, 198 (2d Cir. 2004); (quoting Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001)). A court "must 'make every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Henry, 409 F.3d at 63 (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065); see also Cox, 387 F.3d at 198; United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6 (2003) (per curiam).

Under the prejudice prong of the Strickland test, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068; <u>see also</u> <u>Flores v. Demskie</u>, 215 F.3d 293, 300 (2d Cir. 2000). "A reasonable probability is one sufficient to undermine confidence in the outcome the trial or appeal." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068; <u>see also</u> <u>Cox</u>, 387 F.3d at 199 ("The level of prejudice [a petitioner] need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case.")(internal quotation marks omitted). A court must review the prejudicial effect of counsel's errors in the aggregate. <u>See</u> <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." <u>Strickland</u>, 466 U.S. at 700, 104 S. Ct. at 2071. To prevail under <u>Strickland</u>, a petitioner must meet the standards of both prongs of the test. However, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2069.

For the purposes of AEDPA, it is well settled that the <u>Strickland</u> standard constitutes the relevant "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Sellan v. Kuhlman</u>, 261 F.3d 303,

315 (2d Cir. 2001).  Thus, on habeas review, the question before the

court is not whether, as a _de novo_ matter, it finds counsel to have

been effective or ineffective; rather, the relevant question is

whether the state court decision addressing the issue involved an

"unreasonable application" of the _Strickland_ standard to the facts

of the petitioner's case.  _See Sellan_, 261 F.3d at 314-15 & n.6.

Unreasonable in this context means "objectively unreasonable,"

_Williams_, 529 U.S. at 409, 120 S. Ct. at 1495, and involves "some

increment of incorrectness beyond error." _Sellan_, 261 F.3d at 315

(quoting _Francis S. v. Stone_, 221 F.3d 100, 111 (2d Cir. 2000));

_accord Mance v. Miller_, No. 01 Civ. 5243 (JSM), 2002 WL 377533, at

*5 (S.D.N.Y. Mar. 8, 2002).

      B.    _Application_

    Petitioner contends that his counsel failed to use the DD-5

police report to: (1) contest the issue of probable cause at the

pretrial suppression hearing by questioning the basis of the

information Assistant District Attorney Scaccia relayed to the

arresting officer, and (2) impeach the credibility of Washington,

the prosecution's sole eyewitness, during trial.  The state court

dismissed Petitioner's ineffective assistance of counsel claim, and

found that trial counsel's decision to focus on other, more

significant inconsistencies in Washington's testimony was not

unreasonable.  (_See_ 440 Dec. at 8-9.)  The state court further found

21

that trial counsel's decision not to use the DD-5 police report to bolster or further develop arguments already made by counsel did not prejudice Petitioner.  (See id. at 9.) Finding no prejudice under the second prong of Strickland, the state court chose not to rely on Strickland's first prong. (See id.)  The state court's decision was neither contrary to, nor an unreasonable application of, the Strickland standard.

Petitioner's claim of ineffective counsel, in the context of both the pretrial hearing and the trial, is predicated solely on an apparent inconsistency posed by the time and date indicated on a DD-5 police report.  The DD-5 report indicates that Washington was at the 46th Precinct from approximately 4:30 until at least 4:56 p.m. on September 18, 2010. (See DD-5 Police Report, dated September 18, 2002 ("DD-5 Report"), attached as Ex. 20 to Pet'r Mem.)  During cross-examination, however, Washington stated that between the hours of 4:00 and 4:30 on September 18, he was riding a number 41 bus home from work, when he saw Petitioner in the vicinity of 2427 Webster Avenue.  (See Trial Tr. at 505.)  Petitioner contends that because Washington couldn't possibly have been in both places at the times indicated, the DD-5 Report establishes conclusively that Washington's identification testimony was false.  (Pet'r Mem. at 17.)

i.    Probable Cause

Scaccia argued at the pretrial hearing that probable cause to arrest Petitioner was clearly established where she received information from Washington—who knew Petitioner and witnessed him commit murder—that he had just seen Petitioner on the street. (See Hr'g Tr. at 178.)  Washington provided Scaccia a description of Petitioner, including a physical description and details of his clothing and location. (See id.)  Withers, the arresting officer, testified at the pretrial hearing how he received a phone call from Scaccia directing him to arrest a suspect wearing a purple jersey and white do-rag in the vicinity of 2427 Webster Avenue. (See id. at 160, 178.)  Withers proceeded to that address where he arrested Petitioner, who matched the description provided to Scaccia by Washington. (See id. at 160.)

Petitioner contends that trial counsel provided ineffective assistance because he neglected to argue at the pretrial hearing that, because neither Washington nor Scaccia testified at the pretrial hearing, the prosecution failed to set forth a basis of knowledge on which to find probable cause to arrest Petitioner. (See id.)  Petitioner argues that this error was further compounded by trial counsel's failure to use the DD-5 report to attack the reliability and accuracy of the information Washington purportedly gave to Scaccia, and that Scaccia relayed to the arresting officer.

Petitioner's argument implicitly recognizes that the basis of Scaccia's information would easily have been established by calling Scaccia, who argued the People's case at the pretrial hearing, to testify as to the nature and source of the information she received about Petitioner.   Trial counsel had good reason not to call Scaccia, however, as she inevitably would have testified that she had received a call from Washington during which he described having just seen Petitioner, who Washington identified as one of the two people responsible for the murder, in the vicinity of 2427 Webster Avenue.   Indeed, in her argument at the close of the pretrial hearing, Scaccia described how she had called Withers, and furnished him with a description of Petitioner and his location.   Scaccia did not explicitly say at this point in the hearing that Washington was the source of the information, but it is clear from a review of the record that no party at the hearing could plausibly argue that there was any question as to the source of Scaccia's information.

In any event, trial counsel did in fact make the argument that the prosecution had failed to establish probable cause.  Petitioner conceded as much in his brief in support of his § 440 motion, where he stated that "[trial counsel] half-heartedly argued at the end of the hearing that the people had not established probable cause for the arrest."   (See Pet'r 440 Mem. at 6.)   As the trial court recognized, Petitioner does not truly assert that trial counsel

24

failed to raise the issue of probable cause, rather, Petitioner asserts essentially that "[trial counsel] did not do so to [Petitioner's] liking." (See 440 Dec. at 9.)

Petitioner's contention that trial counsel should have used the DD-5 report to further develop the argument that the police lacked probable cause to arrest petitioner is similarly without merit. Even if there was inconsistent evidence as to the precise time Washington saw Petitioner on the street, this would do little to undermine Washington's identification of Petitioner as the second shooter. Moreover, there is no basis to conclude that use of the DD-5 police report at the pretrial hearing would have effectively pointed out the inconsistency in the time Washington claimed to have seen Petitioner on the street. Washington did not testify at the pre-trial hearing and there was no other pretrial testimony as to the time of Washington's on-street identification of Petitioner. The alleged inconsistency had not yet arisen and, accordingly, defense counsel was not ineffective for failing to use the DD-5 police report to highlight it.

ii.   Impeachment of Washington

In his affirmation submitted in response to Petitioner's § 440 motion, Petitioner's trial counsel stated that "in light of the . . . testimony by the People's witnesses that the police took [Petitioner] into custody based upon information provided by Mr.

25

Washington, [he] considered the DD-5 report to represent, at best,
a minor inconsistency." (See Affirmation of Allan Morofsky, dated
March 26, 2009 ("Morofsky Aff.") at 1-2, attached as Ex. 6 to Resp't
Mem.)  Defense counsel decided that it would be strategically more
sound to focus on other inconsistencies in Washington's testimony.
(See id. at 2.)  This was a reasonable strategic decision.

Assuming that the DD-5 Report was entirely accurate as to the
time it was signed by Washington, this would suggest, at most, that
Washington was incorrect as to the time that he claimed to have seen
Petitioner on the street.[6]  The inconsistency posed by the time
stated on the DD-5 Report and the time at which Washington claimed
to have seen Petitioner on the street does not, contrary to
Petitioner's contention, directly undermine Washington's testimony
to having witnessed Petitioner commit murder nine days earlier.  Nor
does it seriously undermine the fact that Washington saw Petitioner
when he was riding on a bus, knew him to be the person involved in
the shooting, and called Scaccia to report the sighting.  As further
noted by defense counsel in his affidavit, it was undisputed that
after being notified by Scaccia, the police actually did respond to

_____

[6] Respondent notes that the 46th Precinct, where the DD-5
Report was signed, and 2427 Webster Avenue, where Washington saw
Petitioner, are less than a mile apart. (See Resp't Mem. at 10.)
Washington could plausibly have seen Petitioner after leaving the
46th Precinct.

a call from Washington; Petitioner, who fit the description provided

by Washington, was arrested at the location provided by Washington;

and Washington subsequently confirmed that the individual arrested

was the man he had seen earlier that day on Webster Avenue, and that

he knew him from seeing him every day for at least two months.  More

importantly, Washington confirmed that Petitioner was the man he saw

firing a gun from his apartment on the night of the murder.  Given

the above, there is no reasonable likelihood that the outcome of

Petitioner's trial would have been different had trial counsel

pointed out the inconsistency in the time Washington allegedly saw

Petitioner on the street.  Trial counsel reasonably concluded that

his efforts were best focused on emphasizing Washington's most

serious credibility issues, by attacking Washington on the key issue

of what he actually saw on the night of the murder.

In denying Petitioner's § 440 motion, the hearing court stated

that it was clear that trial counsel "chose not to examine the

inconsistency within the DD-5 report because there were other

inconsistencies he elected to focus on, such as Washington's

testimony regarding the shooting."  (440 Dec. at 8.)  The trial

court listed several of the inconsistencies raised by trial counsel

and weighed by the jury, including that Washington:

> lied to the police when he described two fictional men as
> the perpetrators immediately following the shooting, that
> he made a deal with drug traffickers in which he was

27

> supplied with free illegal drugs in exchange for his
> silence regarding the identity of the actual
> perpetrators, and that he had taken heroin and cocaine
> approximately two and a half hours before witnessing the
> shooting . . .

(Id.)  Thus, the hearing court concluded that counsel's strategic decision did not prejudice Petitioner's trial, and precluded a finding of ineffective assistance.  That decision was not an unreasonable application of the Strickland standard.  See United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (defendant's claim that lawyer had failed to thoroughly impeach prosecution's witness did not rise to ineffective assistance because decisions about the nature and extent of cross-examination are strategic); United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987) (reasonable decisions about trial strategy, including "whether to engage in cross examination, and if so to what extent and in what manner," do not constitute a basis for an ineffective assistance claim). Accordingly, Petitioner's ineffective assistance claim should be dismissed.

## III. Admissibility of Identification Testimony

Petitioner contends that the state court's decision that Washington's pretrial identification of Petitioner was merely confirmatory, and that Washington's subsequent in-court identification was reliable, was unreasonable and deprived Petitioner of his right to due process. (Pet'r Mem. at 31.)

28

Respondent maintains that the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  (See Resp't Mem. at 16.)

A.   Legal Standard

The Supreme Court has established a two-part test for determining the admissibility of in-court identification testimony subsequent to suggestive pretrial identification procedures. First, courts must determine whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); see also Manson v. Brathwaite, 432 U.S. 98, 105-14, 97 S. Ct. 2243, 2248-53 (1977); Neil v. Biggers, 409 U.S. 188, 196-97, 93 S. Ct. 375, 381 (1972); Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001); United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992).  If the procedure is determined to be impermissibly suggestive, then courts must determine, under the totality of the circumstances, whether the identification was nevertheless reliable. See Manson, 432 U.S. at 114, 97 S. Ct. at 2253 ("reliability is the linchpin in determining the admissibility of identification testimony"); Biggers, 409 U.S. at 199, 93 S. Ct. at 382 (same.).  If a court determines the identification to be reliable, testimony about the identification is admissible. See, e.g., Manson, 432 U.S. at 114, 97 S. Ct. at

29

2253; Wiggins v. Greiner, 132 Fed. App'x 861, 864 (2d Cir. 2005).

In assessing the reliability of an identification, courts consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382; see also Manson, 432 U.S. at 114, 97 S. Ct. at 2253; Concepcion, 983 F.2d at 377.

B.   Application

Single-photo identification procedures are generally considered to be impermissibly suggestive.   The Second Circuit has "consistently condemned the exhibition of a single photograph as a suggestive practice." Mysholowsky v. People, 535 F.2d 194, 197 (2d Cir. 1976); see also Wiggins, 132 Fed. App'x at 865.   Respondent argues that in Petitioner's case, the identification occurred while Washington was riding a bus, was absent any police involvement, and was merely confirmatory. (See Respt's Mem. at 19.)   Petitioner's argument, however, is that there is no way of verifying that Washington ever identified Petitioner on the street, and that it was only through the impermissibly suggestive pretrial single-photo identification procedure that Washington positively identified Petitioner at trial. (See Petitioner's Reply Memorandum of Law in

Support of Petition for Writ of Habeas Corpus, dated June 28, 2010 (Pet'r Reply Mem. at 7.)   Even if this Court were to accept Petitioner's argument that the single-photo identification procedure was impermissibly suggestive, the inquiry would not end there.   The analysis must then shift to the reliability of the subsequent identification.

In deciding that the pretrial identification procedure was merely confirmatory, the Appellate Division assessed the reliability of the pretrial identification using a set of factors which closely tracks federal law governing independent source determinations set forth in Biggers.   Specifically, the   Appellate Division's reliability determination was based on the court's determination that:

> [a]lthough the witness did not know [Petitioner's] name, he had seen [Petitioner] in the vicinity of his apartment building every day for a few months and often in the company of the witness's supplier of narcotics. [Petitioner] had also been in the witness's apartment on the night of the shooting. Furthermore, the witness saw [Petitioner] on the street and called the police approximately a week after the homicide, and made the photo identification that same day.

People v. Burgess, 836 N.Y.S.2d 94, 40 A.D.3d 322.   Petitioner contends that the Appellate Division's reliability determination was an unreasonable application of Biggers. (See Pet'r Mem. at 31.)

Specifically, Petitioner contends that the identification was not reliable because: (1) Washington's opportunity to view the

31

second shooter was limited, because he went directly to his bedroom to use the drugs Conner delivered; (2) the living room was too dark to reliably identify the shooters at the time of the shooting; (3) Washington's drug usage prior to the shooting compromised his attentiveness; (4) Washington's pre-identification description of Petitioner lacked specificity and detail; and (5) the nine-day period between the shooting and Washington's identification of Petitioner diminished the reliability of Washington's identification.  (Pet'r Mem. at 33-35.)

Notwithstanding Petitioner's disagreement, this Court cannot conclude that the state court unreasonably applied Biggers. Application of the Biggers factors establishes that Washington's identification of Petitioner was independently reliable and, therefore, properly admitted.  Washington had ample opportunity to view Petitioner when Conner, accompanied by Petitioner, delivered drugs to Washington's apartment on the day of the shooting. Contrary to Petitioner's assertion, Washington did not immediately go to his room after allowing Conner and Petitioner into his apartment; rather, he testified to having a short conversation with Conner before retiring to his room.  (See Trial Tr. at 389, 466-67.) Washington had ample time to observe Petitioner, whom he already knew from the neighborhood, in a relatively relaxed and unhurried environment. See Torres v. Woods, No. 04 Civ. 5560 (ARR), 2005 WL

1541047, *5 (E.D.N.Y. June 30, 2005)(witness had ample opportunity to observe petitioner where petitioner had brief conversation with witness before robbing a third party, and where witness "saw petitioner on a number of occasions" when they previously attended school together); Valentine v. Skinner, No. 04 Civ. 1416 (LAP)(JCF), 2005 WL 165285, *3 (S.D.N.Y. Jan. 25, 2005)(chances of misidentification minimal when the witness recognized the petitioner from seeing him around the neighborhood during the months prior to the crime).

In addition, approximately ten minutes after speaking with Conner, Washington emerged from his bedroom and saw Petitioner and Conner firing guns from the window. (See id. at 392.) Though the living room lights were off, the kitchen lights were on, and Washington was able to see well enough to note that Conner fired his gun from the left window while Petitioner fired from the right window. (See id. at 393, 455-56.)

Washington admitted to snorting one line of heroin and taking a "hit" of cocaine on the night of the murder, but testified that his drug use did not in any way impair his ability to observe Petitioner. (See id. at 530.) As noted by other district courts in this circuit, "drug consumption does not necessarily negatively impact the ability of an eyewitness to make an identification." See DeChirico v. Walker, 558 F. Supp. 2d 355, 368 n.6 (E.D.N.Y.

33

2008)(collecting cases).

Washington described Petitioner as a "black male, about 18, who hangs around the neighborhood," and provided no specific details about physical traits.  (See Trial Tr. at 349.)  While Washington's description of Petitioner may indeed have been general, "[t]he absence of a prior description weighs neither for nor against reliability." See Richardson v. Sup't of Mid-Orange Corr. Facility, No. 09-3655-pr, 2010 WL 3619781, at *6 (2d Cir. Sept. 20, 2010) (citing United States v. Concepcion, 983 F.2d 369, 377-78 (2d Cir. 1992)).  "Although a witness' identification of someone who does not match the witness' prior description weighs heavily against reliability, the absence of a prior description does not carry the same weight." Richardson, 2010 WL 3619781, at *6 (citing Chavis v. Henderson, 638 F.2d 534, 537 (2d Cir. 1980)).

At no time did Washington appear uncertain of his identification of Petitioner.  The Appellate Division noted that "the witness saw [Petitioner] on the street and called the police approximately a week after the homicide, and made the photo identification that same day." Burgess, 40 A.D.3d at 322.

Finally, Petitioner's claim that too much time had passed between the shooting and the identification is without merit. Courts in this circuit have routinely found that periods of time far greater than nine days may elapse without compromising the

34

reliability of a witness's identification.   See, e.g., Hoyle v. Lape, No. 08 Civ. 4839 (JG), 2009 WL 928342, at *11 (E.D.N.Y. Apr. 3, 2009)(on-street identification of petitioner by victim three weeks after incident not unreliable).   Indeed, even when the interval between the crime and the identification is longer than desirable, this factor can be outweighed by other indicia of reliability.   See, e.g., United States v. Wong, 40 F.3d 1347, 1360 (2d Cir. 1994) (ten-month gap between incident and identification outweighed by the witness's opportunity to observe defendant for two to three seconds before ducking under table); United States v. Jacobwitz, 877 F.2d 162, 168 (2d Cir. 1989) (ten-month gap between incident and identification not too long when outweighed by other factors).   Here, where Washington testified to seeing Petitioner every day over a period of at least two months, the chances of misidentification are slight, and an interval of as short a time as nine days is of little consequence.

After reviewing the record, there is no basis for this Court to conclude that, under the totality of the circumstances, the state court's conclusion that Washington's identification of Petitioner was reliable was either an unreasonable determination of the facts presented in the state court proceeding or contrary to clearly established federal law.   Accordingly, I respectfully recommend that this claim be dismissed.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that Petitioner's request for habeas relief be denied and that this action be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000). The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d) (2008). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Barbara S. Jones, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Jones. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 145, 155, 106 S. Ct. 466, 470, 475 (1985); Frank

36

v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of

Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: October 21, 2010
       New York, New York

Copies mailed to:

Florian Miedel, Esq.
Law Office of Florian Miedel
111 Broadway, Suite 1401
New York, NY 10006

T. Charles Won, Esq.
Bronx County District Attorney's Office
198 East 161st Street
Bronx, NY 10019